## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CHRISTINE GREEN**<br>**o/b/o T.G.** | **CIVIL ACTION** |
| **VERSUS** | **NO: 09-6577-KDE-SS** |
| **MICHAEL J. ASTRUE, COMMISSIONER**<br>**OF SOCIAL SECURITY**<br>**ADMINISTRATION** | |

## REPORT AND RECOMMENDATION

Plaintiff, TG, by and through her next friend and mother, Christine Green ("Ms. Green"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for supplemental security income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382(c).

## PROCEDURAL HISTORY

On December 1, 2001, Ms. Green submitted an application for SSI on behalf of TG.  She alleged that the disability began on November 12, 2001 because of a skin disorder and speech problems.  R. 59-61.  On May 9, 2002, the Commissioner notified TG that her application for SSI was denied.  R. 46-49.  There is no evidence that Ms. Green sought further review of the denial of the application.

On January 26, 2006, Ms. Green submitted a second application for SSI on behalf of TG. R. 16.  On May 12, 2006, the Commissioner notified TG that her second application for SSI was denied.  R. 50-52.  On March 4, 2008, there was a hearing before an Administrative Law Judge

("ALJ").  R. 34 and 479.  TG was represented by counsel at the hearing.  On June 11, 2008, the ALJ

issued an unfavorable decision.  R. 13-29.  On July 28, 2009, the Appeals Council denied Ms.

Green's request for review.  R. 3-5.  On September 30, 2009, she filed a complaint on behalf of TG.

R. 1.  The Commissioner answered.  Rec. doc. 11.  The parties filed cross-motions for summary

judgment.  Rec. docs. 17 and 18.

## STATEMENT OF ISSUES ON APPEAL

Issue no. 1.    Did the ALJ reject the findings of three treating physicians in favor a non-physician
                and err by doing so?

Issue no. 2.    Did the ALJ err by interpreting a physician's statements as a finding of no
                limitation?

Issue no. 3.    Did the ALJ err by not contacting the treating physician pursuant to 20 CFR
                404.1512(e)(1).

## THE COMMISSIONER'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following findings relevant to the issues on appeal:

1.    TG was born in 1998.  Therefore, she was a school-age child on January 26, 2006, the date
      the application was filed, and remained a school-age child as of the date of the ALJ's
      decision (20 CFR 416.926a(g)(2)).

2.    TG has not engaged in substantial gainful activity at any time relevant to this decision (20
      CFR 416.924(b) and 416.972).

3.    TG has the following severe impairment: Essential Hypertension (20 CFR 416.924(c)).

4.    TG does not have an impairment or combination of impairments that meets or medically
      equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
      416.924, 416.925 and 416.926).

5.    TG does not have an impairment or combination of impairments that functionally equals the
      listings (20 CFR 416.924(d) and 416.921a).

6.    TG has not been disabled, as defined in the Act, since January 26, 2006, the date the
      application was filed (20 CFR 416.9(a)).

R. 19-29.

2

## ANALYSIS

**a**.    **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Perez, 415 F.3d at 461. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Villa, 895 F.2d at 1022; Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).  "The

Commissioner, rather than the courts, must resolve conflicts in the evidence." Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).

The issue is whether TG is "disabled" under the definition found in 42 U.S.C. § 1382c(a)(3)(C)(i) which states:

> An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

Id. The regulations thereunder mandate the following three step analysis:

> We follow a set order to determine whether you are disabled. If you are doing substantial gainful activity, we will determine that you are not disabled and not review your claim further. If you are not doing substantial gainful activity, we will consider your physical or mental impairment(s) first to see if you have an impairment or combination of impairments that is severe. If your impairment(s) is not severe, we will determine that you are not disabled and not review your claim further. If your impairment(s) is severe, we will review your claim further to see if you have an impairment(s) that meets, medically equals, or functionally equals in severity any impairment that is listed in appendix 1 of subpart P of part 404 of this chapter. If you have such an impairment(s), and it meets the duration requirement, we will find that you are disabled. If you do not have such an impairment(s), or if it does not meet the duration requirement, we will find that you are not disabled.

20 C.F.R. § 416.924(a).

**b**.   **Testimony at the Hearing**.

TG testified first and outside of the presence of her mother.  At the time of hearing she was nine years old.  R. 484.  She was in regular classes in the fourth grade.  R. 484.  She was getting A's and B's.  R. 484.  Her favorite subjects were math and social studies.  R. 484.  She did not have any friends at school.  R. 485.  She did not talk to anyone because of her hair problems.  R. 485.  She did not play any sports at school.  R. 486.

4

TG was excused from the hearing room and Ms. Green testified.  The last six years were a struggle for TG at school.  R. 487.  She took special classes.  R. 487.  She had severe hair loss, lots of rashes and side effects from the medication.  R. 488.  As a result of the medication, she suffered from nausea and ups and downs. R. 489.  The outbreaks on her skin lasted six to eight months.  R. 489.  Other children picked on her because of her hair loss and other conditions.  R. 489.  She was diagnosed with hypertension three years before the hearing.  R. 489.  The medication was starting to take a toll on her kidneys.  R. 490.  She was taken out of school frequently because of her medical problems.  R. 490.  She had asthma with long periods where she was out of breath and wheezing.  R. 491.  She had a small tumor near the pituitary gland.  R. 492.

**c.**      **School and Language Evidence**.

The record contains the following: (1) Individual Evaluation - Washington Parish Schools, dated June 7, 2001 (R. 68-74); (2) Louisiana Department of Education individual evaluation on June 7, 2001 (R. 75-81); and (3) School Function Report completed in response to a February 2, 2002 request from Department of Social Services (R. 93-99).  In addition to those records, the Covington Speech and Language Center completed an evaluation on April 15, 2002 at the request of SSA.  R. 170-73.

A teacher questionnaire was completed on a SSA form.  R. 116-123.  It is not dated, but it reflects that it was received by the Disability Determinations office in Baton Rouge on March 9, 2006.  R. 116.  On April 29, 2008, counsel for TG submitted records from Wesley Ray Elementary School for March 6, 2008 through April 18, 2008.  R. 139-146.  On May 7, 2008, the LEAP score for TG was submitted.  R. 147-48.

TG was less than three years old when the June 7, 2001 individual evaluation was completed. The report concluded that TG's gross motor, fine motor, and cognitive skills were all within normal limits. R. 73. The speech and language evaluation indicated that she exhibited a moderate to severe articulation delay characterized by sound omissions, substitution, and distortions. Language evaluation revealed no delays. Hearing acuity, vision, voice and fluency were all judged to be adequate. R. 73. It was recommended that a structured approach be used to remediate the articulation errors. R. 73. See also R. 75-81. The report notes that:

> [M]edical testing revealed precancerous cells in newly discovered large growths on the back of . . . (her) neck. She was given steroids to reduce the growths. She is no longer on steroids. She is currently taking antibiotics.

R. 73.

On February 2, 2002, Disability Determinations requested that TG's teacher at Wesley Ray Elementary School complete a questionnaire. Essie Williams completed the questionnaire on February 15, 2002. It revealed that: (1) Williams had known TG about five months and was with her about seven hours per day, five days a week; (2) she was in special education; (3) during the year she missed five days because of illness; (4) she was slow to talk; (5) she required speech therapy; (6) she depended on her sister, but got along with other students; (7) she listened and behaved appropriately; (8) she did whatever she was asked to do; (9) once or twice a week she displayed a lack of motivation and three to four times a week she was overly sensitive to criticism; (10) she was able usually to carry out the elements of concentration, persistence and pace; (11) she was limited occasionally in her ability to carry out short and simple instructions; and (12) she did not exhibit any sudden change in her behavior. R. 93-99.

The April 15, 2002 evaluation concluded that: (1) TG exhibited low average language skills; (2) articulation was within normal limits; (3) disfluencies were not noted; (4) voice was within normal limits; and (5) intelligibility was 90% in known contexts and 80% in unknown contexts. R. 170-73.

The unsigned undated teacher questionnaire was received by the Disability Determination office in Baton Rouge on March 9, 2006. The school is identified as the Wesley Ray Elementary School. The person completing the form reported that she saw TG not only at school but also at church and grocery stores. The teacher reported that: (1) TG was in the second grade; (2) she was always at school unless she was sick; (3) her mother was required to take her to the doctor often; (4) she had no problem in acquiring and using information; (5) she had either no or slight problems in attending and completing tasks; (6) she had either no or slight problems with interacting and relating with others; (7) almost all of her speech could be understood; (8) she had slight problems in moving about and manipulating objects; and (9) she had no problems in caring for herself. R. 116-121. The teacher reported that TG had medical problems including some form of cancer, blood disease, high blood pressure and hair loss. The teacher described TG as a "sweet child" and that something was "not well with her physically." She was "smaller than her twin sister." Her mother was described as a "good parent." R. 122. The teacher provided additional positive comments regarding Ms. Green. R. 123.

In the spring of 2008, TG was in the fourth grade at Wesley Ray Elementary School. She had B's in science and social studies and C's in language arts, mathematics and reading. R. 141. An instructor in a student enhancement program, who had tutored TG since July 2007 in language arts and math, reported that: (1) TG tried hard to complete her work but she had difficulty keeping

up with other students her age; (2) she required help in various language art skills, for example summarizing stories and drawing conclusions; (3) she had shown improvement in the use of correct grammar; (4) in math she did not know all of her single-digit multiplication; (5) her addition and subtraction skills were adequate; and (6) with one-on-one instruction she could make progress to a grade-appropriate level. R. 145.  The principal of the school reported that: (1) TG had attended the school since she was three; (2) she began in a special education program; (3) because of her illness during her preschool and kindergartern grades, she missed many days of school; (4) she continued to do so in later school years; (5) from second through fourth grade it was determined that TG must have one-on-one help and remediation; and (6) without this help her grades would not have improved.  R. 146.  On May 6, 2008, Ms. Green was notified that TG did not pass the LEAP test. She was eligible for summer classes in language arts and mathematics.  R. 147.

**d**.  **Medical Evidence-Submitted with First Application**.

On December 28, 1998, TG was taken to the emergency room at Bogalusa Community Medical Center ("Bogalusa ER") and seen by Dr. Anthony J. Palazzo of the Pediatric Clinic for a cold.  R. 314-15.  On November 24, 1999, she was taken to the emergency room at Washington - St. Tammany Regional Medical Center ("Washington-St. Tammany ER") for diarrhea, fever and colds. R. 310-13.  Wheezing was noted.  R. 311.  On March 11 and 12, 2000, she was taken to the Bogalusa ER with complaints of vomiting and diarrhea.  R. 298-309.  The diagnosis was acute gastroenteritis.  There was a need for follow-up.  R. 300.  Phenergan was prescribed.  R. 301.  On November 20, 2000, she was diagnosed at Bogalusa ER with vomiting and a viral syndrome.  R. 294.  Clear liquids were prescribed.  R. 294-95.  On December 23, 2000, she was taken to the Washington-St. Tammany ER with complaints of runny nose and bleeding from the nose.  R. 290.

On March 14, 2001, when she was about two years old, TG was seen by Dr. Glenn Russo, a dermatologist at Covington Dermatology. Ms. Green reported that: (a) her daughter's hair was falling out; (b) she scratched it a lot; and (c) she had knots on the back of her scalp and bumps on her left palm for the previous month. The condition of the left palm was consistent with granuloma annulare. The posterior scalp was scaly with alopecia. There were two large lymph nodes at the base of the scalp. R. 169. A culture of the fungal scalp was sent for analysis. R. 168. Creams were prescribed for the other conditions. TG was to return in two weeks. R. 167 and 169. On April 2, 2001, Ms. Green and TG returned to Covington Dermatology where she was seen by Dr. Joseph Shrum, an assistant professor of Dermatology at Tulane. Ms. Green reported that TG was experiencing some fever up to 104 degrees. Dr. Shrum noted that on the day of the visit she was playful and without fever. The culture showed an occasional mold. Dr. Shrum discussed the lymph nodes with TG's pediatrician. R. 166. On April 16, 2001, Ms. Green reported that the scalp and lymph node condition had improved. TG's pediatrician had prescribed oral antibiotics. R. 165. On May 7, 2001, TG was seen by Dr. Shrum. The lymph node condition was resolved. There were some fine papules on her face. Lotion was prescribed for the face. R. 164. On June 4, 2001, Dr. Shrum found numerous fine papules on the forehead and scalp, a probable lymph node on her scalp, and some minor yellow crusting in the hair. She was diagnosed with atopic dermatitis and impetigo. Some areas were treated with penicillin. R. 163. On June 19, 2001, Dr. Larry Millikan of Covington Dermatology reported that there was still some scale, she was getting hyperpigmentation and thickening of the skin on her hands and feet. The medication was changed. R. 162. On July 17, 2001, Ms. Green reported to Dr. Shrum that TG was better. Fine papules over the scalp remained. There was an annular lesion on the left hand. The lymph node condition was barely

palpable.  Medication was prescribed.  She was to return in one month.  R. 161.  On September 10, 2001, Dr. Shrum diagnosed TG with probable atopic dermatitis in the scalp, cheeks and groin and improving granuloma annulare.  R. 160.  On October 8, 2001, Dr. Shrum found fine papules.  The medication was changed.  R. 159.  On November 5, 2001, there were fine papules all over the scalp and the suggestion of a lymph node on the neck.  A biopsy was taken.  R. 158.  The result was consistent with atopic dermatitis.  R. 155-57.  Ms. Green was encouraged to loosen TG's braids. Conservative treatment was continued.  She was to return in two months.  R. 155.  On January 7, 2002, Ms. Green and TG returned to Dr. Shrum for evaluation of lesions on her hand and leg.  The diagnosis was granuloma annulare.  Cream was prescribed.  She was to return in one  month.  R. 154.

On February 7, 2002, Dr. Shrum wrote to Dr. Walker, a medical consultant for DSS, and reported that,

> (TG) has been seen for several conditions.  One of these conditions was granuloma annulare a benign yet sometimes slightly persistent condition seen in children and adults.  There's no definitive treatment for this condition and over the course of seeing . . . (TG), some of her lesions which are usually around the hands have appeared then resolved completely and have reappeared to some extent.  Another condition for which . . . (TG) has been followed is a papular scaly condition of the scalp which has been diagnosed as bacterial or fungal folliculitis although no definitive organism has ever been cultured, . . . (TG) has been treated with oral antifungal and antibacterials for this condition and I have also urged the mother on several occasions not to tie the child's braids so tightly as this may be contributing to her alopecia.  The final diagnosis that . . . TG has and which has been the most consistent diagnosis throughout my time of seeing her has been that of atopic dermatitis.  This has consisted of some fine papular lesions over the trunk and face. These have been treated with various topical modalities including Protopic and steroids.  (TG) has shown some improvement with these medications though atopic dermatitis is a chronic condition which is cyclical in nature both with or without treatment.  Despite having these different diagnoses none of these conditions is disabling or limits (TG's) functioning.

R. 153.

On May 4, 2001, TG was seen at the Bogalusa ER for an injury to her right foot from walking on glass. The foot was to be soaked twice a day. R. 285. An X-ray was normal. R. 289. On November 18, 2001, she was seen at the Washington-St. Tammany ER. The diagnosis was acute tonsillitis. R. 281-84.

On December 4, 2001, TG was seen by Mamatha Ananth, M.D., a pediatrician, for complaints of knots behind ear. R. 150. On February 27, 2001, TG was taken to Dr. Ananth for complaints of a rash on her left hand. R. 152. On April 4, 2001, TG was returned to Dr. Ananth for complaints of high fever. The diagnosis was sinusitis. R. 151.

On May 7, 2002, a state medical consultant completed a childhood disability evaluation form based on a review of the medical records. The impairments considered were atopic eczema and a speech and language deficit. R. 174. The consultant found no limitations in any of the domains. R. 174-79.

On May 9, 2002, the Commissioner notified TG that her application for SSI was denied. R. 46-49.

**e**.     **Medical Evidence-Submitted with Second Application**.

**2004-2005**

On January 5, 2004, Dr. Palazzo, the pediatrician, referred TG to Dr. Wesley Galen, a dermatologist. R. 208. On March 17, 2004, she was taken to the Bogalusa ER with a report that she was in a motor vehicle accident and the car in which she was riding was hit from behind. R. 276. There was no apparent injury. R. 275. On January 14, 2005, she was taken to Dr. Palazzo for skin symptoms. The diagnosis was contact dermatitis due to plants. R. 209-10. On February 25, 2005, she was brought to Dr. Palazzo, who diagnosed tinea capitis (fungal infection of the scalp). He

recommended a consult with a dermatologist.  R. 205-07.  On December 29, 2005, TG was taken to Dr. Palazzo for a boil on her right leg.  The physical examination found TG well developed and nourished and she was not in acute distress.  She was diagnosed with acute sinusitis.  The skin abscess was drained.  R. 211-12.

## 2006

On January 5, 2006, TG was seen by Dr. Palazzo for screening for hypertension.  She was seven years old.  She reported wheezing which was worse at night.  There were no skin symptoms.  R. 201.  The submandibular lymph nodes were enlarged but not tender bilaterally.  R. 202.  The diagnosis was hypertension and mild persistent asthma.  R. 203.  Dr. Palazzo referred her to Dr. Cougle for evaluation and treatment of hypertension.  R. 200.  On January 9, 2006, TG was returned to Dr. Palazzo for a hypertension follow-up.  There were no skin symptoms.  The diagnosis was benign essential hypertension.  R. 198-99.  She was referred to Dr. Gedalia at Children's Hospital. R. 197.

On January 13, 2006, TG was seen by V. Matti Vehaskari, M.D., professor of pediatrics and chief of the division of pediatric nephrology at the LSU Health Sciences Center and Children's Hospital.  He reported that:

> She was referred to me for hypertension which was discovered on routine checkup. She has not exhibited symptoms related to her elevated blood pressure levels.  Her physical exam was totally unremarkable except for a blood pressure of 146/72. Laboratory evaluation so far had not shown any specific etiology for her hypertension, but she failed to keep her followup appointment for further evaluation. She was started on pharmacological treatment of her hypertension.  Her hypertension is not causing any functional impairment at this point.  It is possible that she may have some side effects from her medication.

R. 183.

On February 7, 2006, TG was returned to Dr. Palazzo.  Ms. Green reported that she was dizzy and fainted.  There were no skin symptoms.  The diagnosis was unchanged from January 9, 2010.  The plan included consultation with a specialist and a pediatric nephrologist.  R. 194-96.  On February 8, 2006, she was returned to Dr. Palazzo with reports of feeling dizzy at school but she did not feel tired.  R. 192.  The lymph nodes were normal.  The diagnosis and plan were not changed.  R. 193.  On February 20, 2006, Dr. Palazzo referred TG to the University Medical Center Division of Pediatric Cardiology.  R. 188.  On March 2, 2006, she was returned to Dr. Palazzo for screening for hypertension.  She reported no skin symptoms.  R. 190.  The plan was unchanged from January 9, 2010.  R. 190-91.

On April 21, 2006, TG was taken to Dr. Palazzo.  The suboccipital lymph nodes were enlarged bilaterally.  The skin showed plaques with scales and scales were seen on the scalp.  The diagnosis was benign essential hypertension and tinea capitis.  R. 186-87.

On May 10, 2006, a childhood disability evaluation form was completed by Michael Halphen, M.D, a pediatrician and medical consultant for the SSA.  The impairment was essential hypertension.  Dr. Halphen reported that the impairment or a combination of impairments was severe, but did not meet, medically equal, or functionally equal the listing.  He did not find any limitations for any of the domain evaluations except health and physical well-being which was less than marked.  R. 213-19.

On June 1, 2006, TG was taken to Dr. Purnachandra Yerneni, a pediatrician.  He reported that: (1) Ms. Green was switching TG from Dr. Palazzo; and (2) she was seen by specialists for her skin and kidneys.  The chief complaint was hypertension.  R. 462.

On June 14, 2006, TG was taken to the Bogalusa ER for a headache and ear ache which were resolved.  R. 266-67.  On June 22, 2006, TG was taken to the Bogalusa ER for hypertension and glucose.  R. 272.  Ms. Green did not stay to see a physician but left after the triage was completed. R. 273.

On June 21, 2006, Dr. Wesley Galen, a dermatologist, completed a questionnaire relating to acute dermatitis.  R. 367-68.

On June 27, 2006, she returned to Dr. Yerneni.  He reported that the chief complaint was hypertension and Ms. Green wanted TG checked for diabetes.  Ms. Green stated to Dr. Yerneni that, "my daughter takes two BP pills" and she wants her on disability.  R. 339-42 and 465.  On June 28 and July 3, 2006, a provisional diagnosis of diabetes was noted on lab work.  R. 251, 338 and 468.

On September 20, 2006, Ms. Green took TG to Dr. Yerneni and reported that TG was taking hypertension medication but it was not working.  R. 463.  On September 22, 2006, TG returned to Dr. Yerneni with a slight fever.  The diagnosis was bronchitis.  R. 337 and 464.

On September 29, 2006, TG was seen by Dr. Yerneni with complaints of hyperglycemia, and numbness to her left hand and foot.  R. 461.

On December 21, 2006, TG was brought to the Bogalusa ER with a complaint of chest discomfort and hypertension.  R. 243 and 245.  An ECG analysis revealed a normal sinus rhythm and left ventricular hypertrophy.  R. 247 and 250.  A home medication list was provided to Ms. Green.  R. 248.  A chest x-ray revealed that the lungs were clear, the heart was unremarkable and no active disease or congestion was seen.  R. 241.  On December 22, 2006, Ms. Green was instructed to call Children's Hospital for further advice.  R. 249.  On December 22, 2006, TG was taken to Dr. Yerneni for a follow-up after a visit to the ER the night before.  R 336.

14

**2007**

On January 11, 2007, TG was taken to Susan Crawford, M.D., an EENT specialist, on a referral from Dr. Yerneni for nose and throat problems. She was to return in two weeks. R. 234 and 355-358. On January 12, 2007, Dr. Crawford spoke to Ms. Green about tonsil surgery at Children's Hospital. R. 358. On January 20, 2007, TG returned to Dr. Crawford for an inner ear infection and adenotonsillar hypertrophy. Surgery was scheduled. R. 353-54. The results of lab work were reported on February 1, 2007. R. 235-40. On January 29, 2007, TG was taken to Dr. Yerneni. R. 455.

On February 8, 2007, TG was taken to Dr. Yerneni for management of her hypertension. R.335. He reported that he had been treating her for hypertension and bronchial problems since September 29, 2006, she continued to have the problems and "she must come regularly to this office." R. 334. On February 13, 2007, she returned to Dr. Yerneni. R. 456. An echocardiogram found a mild degree of pulmonic insufficiency. R. 330-32 and 471-75.

On February 15, 2007, TG was admitted to the Bogalusa Medical Center with a history of mouth breathing and snoring. The pathology report found evidence of rapid growth of normal cells in the tonsils and adenoids that resembled lymph tissue. R. 225. She was discharged on February 16, 2007, after a tonsillectomy and adenoidectomy. R. 227. Dr. Crawford was the surgeon. R. 231-32 and 350-51. No problems were noted when she returned on February 22, 2007. R. 348-49.

On March 14, 2007, TG was taken to Dr. Yerneni. R. 327. He wrote to TG's school and said:

> (She) is not currently up to date with her curriculum enough to be prepared to take the LEAP test on March 19[th] - 30th. Her ongoing medical problems which include recurring otitis media, acute bronchitis, asthma and atopic dermatitis and

hypertension have caused her to miss excessive classroom hours which greatly affect her scores on this test.  Please exempt this student from testing.

R. 328.  Also on March 14, 2007, he wrote to the Social Security Office and said:

(She) is medically eligible for Supplement Social Security assistance.  She is currently being treated by Dr. Susan Crawford, ENT for otitis media and has recently had tubes put in both ears to try to help her with this illness.  She is being treated at the Children's Hospital in New Orleans for atopic dermatitis and is under a nephrologist, also at Children's Hospital for hypertension.  I am treating her for acute bronchitis and asthma.  She often must use an inhaler to assist her in relief of this breathing problem.  Due to these many medical problems, (she) . . . is having comprehension difficulties at school.

R. 329 and 366.

On March 8, 2007, TG returned to Dr. Crawford with complaints of itching in both ears.  R. 346.  On March 12, 2007, she was started on drops.  R. 345 and 347.  She failed to show for appointments on April 23 and June 19, 2007.  R. 344.

On May 23, 2007, TG was seen by Dr. Yerneni for complaints of nose bleeds and hypertension.  R. 457.

On June 19, 2007, TG was seen by Dr. Yerneni for complaints of ear ache and sore throat. R. 326.  TG was admitted to Bogalusa ER on June 24, 2007.  R. 252 and 398.  She complained of arm pain following a four wheeler accident where she ran into a barbed wire fence.  There were superficial lacerations on her face and arm.  R. 256.  She was transferred to Children's Hospital.  R. 261-62.  After evaluation of an abdominal abrasion, she was discharged on June 25, 2007 on a regular diet and the level of her activity was described as "ad lib."  R. 362. Dr. Yerneni referred TG to Kate McDonald, M.D. of the Farber Dermatology Clinics in Slidell.  R. 452.  On June 25, 2007, TG was seen by Dr. McDonald.  She was to return in two weeks.  R. 383.  Cultures were taken for tests.  R. 381.

On July 13, 2007, TG was taken to Dr. Yerneni.  R. 458.  On July 16, 2007, Ms. Green called Dr. McDonald at the Slidell Dermatology Clinic and requested cream to make the dark marks on TG's face disappear.  R. 380.  On July 20, 2007, TG was taken to Dr. Yerneni with a complaint of a cold.  R. 324.  On July 30, 2007, TG was taken to Dr. McDonald for a follow-up.  She was to return in three weeks.  R. 379.

On August 22, 2007, TG was taken to Dr. Yerneni for hypertension.  R. 434.  TG was taken to the Children's Hospital ER on August 22, 2007 for high blood pressure measured at school.  She left on that date in stable condition.  R. 440.  On August 27, 2007, TG was taken to Dr. McDonald. R. 377.  Dr. McDonald gave TG a school excuse for the day.  R. 376.

On September 18, 2007, TG was seen by Dr. Victor Pouw, a pediatric endocrinologist, for pubertal development.  Screening and an MRI were ordered for pituitary disorders.  R. 436.  On September 24, 2007, TG returned to Dr. McDonald for a follow-up.  R. 373.  Dr. McDonald requested authorization for: (1) a prescription for drug strength shampoo for hair loss (R. 378); and (b) fungal cultures from tissue from TG's scalp (R. 374).  A September 26, 2007 MRI was suspicious for a pituitary lesion.  R. 427. On September 30, 2007, TG was taken to the Bogalusa ER for moderate pain in her right ear.  R. 387-94.

On October 4, 2007, TG was taken to Dr. Yerneni.  R. 435.  On October 23, 2007, TG was taken to Dr. McDonald.  She was to return in four weeks.  R. 370.  On October 25, 2007, she was seen for a follow-up visit by Dr. Pouw.  R. 423.  An MRI taken on October 26, 2007 revealed normal pituitary morphology.  R. 424.

On November 2, 2007, Dr. Richard Coulon, a pediatric neurosurgeon, reported that TG's neurologic examination was normal.  He did not believe there were sufficient changes on her MRI

scan to warrant an exploration of the pituitary gland.  R. 418-19.  On November 19, 2007, Dr.

McDonald completed a form indicating that TG had marked limitations in her ability to develop

more lasting friendships and to enjoy a variety of physical activities.  Dr. McDonald indicated that

her impairment interfered with her health and physical well-being to a marked degree.  R. 478.  On

November 27 and 28, 2007, TG returned to Dr. Yerneni for management of her hypertension and

precocious puberty.  R. 410 and 421.  On November 28, 2007, Dr. Yerneni completed the

questionnaire concerning asthma.  R. 416-17.

**f**.      **Plaintiff's Appeal**.

**Issue no. 1.**      Did the ALJ reject the findings of three treating physicians in favor a non-physician
and err by doing so?

**Issue no. 2.**      Did the ALJ err by interpreting Dr. Galen's statements as a finding of no limitation?

TG contends that: (1) Drs. Wesley Galen and Kate McDonald, treating dermatologists,

provided statements which, if accepted as correct, demonstrate that she meets or medically equaled

the requirements for Listing 108.05 (skin disorders-dermatitis); (2) Dr.Yerneni, a treating

pediatrician, provided a statement which, if accepted as correct, demonstrates that she meets or

medically equaled the requirement for Listing 103.03 (respiratory system-asthma); (3) the statements

provided by Drs. McDonald and Yerneni demonstrate that she functionally equaled the listed

impairments because she was determined to be markedly impaired in two domains; and (4) the ALJ

improperly relied upon the opinion of a medical consultant, Dr. Michael Halphen, a pediatrician,

who did not treat or examine her.  Rec. doc. 17.

At step two of the three step sequential evaluation of a child's alleged impairments, the

Commissioner considers the child's physical impairments to see if she has an impairment or

combination of impairments that is severe.  20 C.F.R. § 416.924(c).  The ALJ found that TG had

essential hypertension and it was a severe impairment.  R. 19.  At step three, the Commissioner reviews the claim to see if the child has an impairment that meets, medically equals, or functionally equals in severity any impairment that is listed in 20 CFR part 404, subpart P, appendix 1.  20 C.F.R. § 416.924(d).  TG challenges the ALJ findings at step 3.

The Commissioner responds that:  (1) Dr. Galen's opinion does not provide evidence that TG meets all the requirements for the dermatitis listing; (2) Dr. Galen was a one-time consultative physician who did not have a longitudinal treatment relationship with TG; (3) Dr. McDonald saw TG only once for a laceration resulting from a 4-wheeler accident prior to rendering her opinion regarding the duration and severity of TG's skin impairment; (4) Drs. Galen and McDonald lacked a longitudinal treatment relationship so they were not able to provide reliable opinions on the duration and severity of the impairment; (5) the responses of Drs. Galen, McDonald and Yerneni to fill-in-the-blank questionnaires were not supported; and (6) TG's impairment did not functionally equal a listed impairment.

### a.     Dr. Wesley Galen.

The record demonstrates that Dr. Palazzo, TG's pediatrician, referred her to Dr. Galen, a dermatologist, on January 5, 2004.  R. 208.  The last prior record of a contact between TG and a dermatologist was on January 7, 2002, when she was seen by Dr. Shrum for an evaluation of lesions on her hand and leg.  Dr. Shrum diagnosed granuloma annulare, and cream was prescribed.  She was to return in one month, but there is no record of a further visit to Dr. Shrum.  R. 154.

Although TG was referred to Dr. Galen on January 5, 2004 because of suspected dermatitis (R. 208), there are no notes of treatment by Dr. Galen.[1]  There is no evidence that TG was seen by

---

[1]  In the June 1, 2006 note for Dr. Yerneni, the history provided by Ms. Green indicated that TG was seen by a specialist for her skin.  The specialist is not identified.  R. 462.

Dr. Galen until he completed a questionnaire on June 6, 2006.  Dr. Galen checked the blanks indicating that she had extensive skin lesions that persisted for at least three months despite continuing prescribed treatment.  R. 367.  As to the limits on her functioning, he indicated that they were "not appropriate for my evaluation."  Id.  This appears immediately after the limitation on acquiring and using information.  The remaining limitations on the form are followed by the note "NA."  Id.  Dr. Galen added the following before signing the questionnaire:

> This is a lovely child with scarring of her scalp & baldness -which followed a scalp infection 3 years ago.  She is sill partially bald & her mother says she is ostracized at school & is very isolated.  She is also being evaluated for hypertension.

R. 368.

> The ALJ considered Dr. Galen's response to the questionnaire and stated that:

> Dr. Galea [sic] opined that the claimant's conditions caused no functional limitations in her abilities in acquiring and using information; interacting and relating with others; moving about and manipulating objects; caring for herself; and health and physical well-being. . . .  Because this assessment is generally supported by the evidence of records [sic] and it supports the claimant's functional capacity established by the Administrative Law Judge, the opinion of the treating physician was afforded controlling weight.

R. 23.

> There are three significant problems with the response of the ALJ and the Commissioner to Dr. Galen's report.  First, the ALJ misunderstood Dr. Galen's response to the questionnaire.  The response demonstrates that it was not appropriate for him to evaluate TG's limitations.  He did not opine that TG's conditions did not cause any functional limitations.  Second, the ALJ failed to obtain Dr. Galen's records of TG's treatment.  Dr. Palazzo referred TG to Dr. Galen on January 5, 2004.  R. 208.  On June 1, 2006, Ms. Green reported to Dr. Yerneni that TG was seen by a specialist for her skin.  R. 462.  Dr. Galen completed the questionnaire on June 21, 2006 on June 21, 2006.  R.

367-68.  His "remarks" at the end of the questionnaire indicate that he had seen TG recently.  For example, he states, "[s]he is still partially bald & her mother says she is ostracized at school. . ."  R. 368.  A reasonable review of this evidence demonstrates a clear need for all of Dr. Galen's records regarding his treatment of TG.  Third, the Commissioner refers to Dr. Galen as a one time "consultative examiner."  Rec. doc. 18 at 5.  There is no evidence to support this statement.[2]  The Commissioner's statement in the brief in support of summary judgment is inexplicable.

These errors and omissions are of such a magnitude that remand is required.  On remand the Commissioner must procure Dr. Galen's records and properly consider his treatment of TG and his response to the questionnaire.

The plaintiff argues that since the ALJ gave controlling weight to Dr. Galen's purported opinion on functional limitations, controlling weight should be given to Dr. Galen's indication that TG's symptoms satisfied the dermatitis listing.  This argument is without merit because there are no medical records from Dr. Galen on which to consider his findings regarding TG's symptoms.

---

[2]  The Commissioner's memorandum refers to Dr. Galen's opinion and cites Tr. 369-370.  These pages do not contain any reference to Dr. Galen.  R. 369 is a letter dated July 24, 2007, from the SSA to Dr. Kate McDonald requesting medical records for TG.  R. 370 is form from Slidell Dermatology Clinic with the notes of TG's visit to Dr. McDonald on October 22, 2007.  R. 370.  Presumably the Commissioner is referring to R. 367-68, which is the questionnaire completed by Dr. Galen on June 16, 2006.

b.      **Dr. Kate McDonald**.

On June 19, 2007, Dr. Yerneni referred TG to the Slidell Dermatology Clinic.  R. 454.  She

was seen by Dr. McDonald, a dermatologist, on June 25, 2007 (R. 383-84); July 30, 2007 (R. 379);

August 27, 2007 (R. 377); September 24, 2007 (R. 373); and October 23, 2007 (R. 370-71).  On July

16, 2007, Ms. Green telephoned Dr. McDonald and requested a cream to make dark marks on TG's

face fade.  R. 380.  The note for the October 23, 2007 visit indicates that TG was to return in four

weeks.  R. 370.  On November 19, 2007, Dr. McDonald completed the two page questionnaire on

the dermatitis listing.  R. 477-78.  Dr. McDonald checked the blanks indicating that TG had

extensive skin lesions that persisted for at least three months despite continuing prescribed

treatment.  R. 477.  Dr. McDonald stated that she could not answer as to the limitation concerning

acquiring and using information.  R. 477.  She indicated that the following limitations were marked:

(a) ability to develop more lasting friendships; (b) ability to enjoy physical activities; and (c) her

health and physical well-being.  R. 477-78.

The Commissioner stated:

Dr. McDonald has seen Plaintiff only once, due to a laceration resulting from a 4-wheeler accident prior to rendering his [sic] opinion regarding the duration and severity of Plaintiff's skin impairment (Tr. 452).

Rec. doc. 18 at 6 (quotation marks and brackets omitted).  This statement is incorrect.  Dr.

McDonald saw TG once a month for four months beginning on June 25, 2007 and TG was to return

for a further visit four weeks after the October 23, 2007 visit.  Contrary to the Commissioner's

statement that Dr. McDonald lacked a longitudinal treatment relationship with TG (Rec. doc. 18 at

6), such a relationship was present.  The Commissioner's argument that the lack of longitudinal

treatment relationship precluded Dr. McDonald from providing a reliable opinion is without merit.

22

The Commissioner's brief in support of summary judgment misstates the record concerning both Dr. Galen and Dr. McDonald.  To describe such a brief as unhelpful is an understatement.  The court should not be required to review the record with a fine tooth comb to make certain that there is evidence to support each statement by counsel for the Commissioner.

      **c.**      **Listing 108.05 Dermatitis, including atopic dermatitis**.

In response to plaintiff's allegation that she was disabled because of atopic dermatitis, the ALJ stated that, "[a]lthough 2002 evidence showed atopic dermatitis there is no evidence that this condition has been recurrent and persistent."  R. 19.  The ALJ found that, "the evidence as stated in this decision provides no evidence that the claimant's atopic dermatitis meets the Listing levels."  R. 20.  The plaintiff responds that two treating dermatologists, Drs. Galen and McDonald, found that she had symptoms which met the  Listing 108.05 criteria.  Rec. doc. 17 at 2.

On March 14, 2001, when she was between two and three years old, she began going to Covington Dermatology, where TG was seen by Dr. Shrum and other dermatologists.  R. 169.  By June 4, 2001, she was diagnosed with atopic dermatitis.  R. 163.  The last reported visit to Dr. Shrum and Covington Dermatology was on January 7, 2002.  R. 154.  On February 7, 2002, Dr. Shrum stated:

> The final diagnosis that . . . TG has and which has been the most consistent diagnosis throughout my time of seeing her has been that of atopic dermatitis.  This has consisted of some fine papular lesions over the trunk and face.  These have been treated with various topical modalities including Protopic and steroids. [TG] has shown some improvement with these medications though atopic dermatitis is a chronic condition which is cyclical in nature both with or without treatment.  Despite having these different diagnoses none of these conditions is disabling or limits [TG's] functioning.

R. 153.

As discussed above, Dr. Palazzo referred TG to Dr. Galen on January 4, 2004, but there is no record of any contact or treatment by Dr. Galen other than the questionnaire, dated June 16, 2006. R. 208 and 367-68.  On several occasions between January 4, 2004 and June 16, 2006, Dr. Palazzo's notes reflect that there were no skin symptoms.[3]  On other occasions there were skin symptoms but no diagnosis of acute dermatitis.[4]

On March 17, 2007, Dr. Yerneni wrote to TG's school concerning the LEAP test and referred to ongoing medical problems, including atopic dermatitis.  R. 328.  At the same time Dr. Yerneni wrote to the Social Security Office and reported that TG was being treated at Children's Hospital for atopic dermatitis.  R. 329.

On June 24, 2007, TG was in the 4-wheeler accident and sustained cuts and abrasions on her face, arms and abdomen from barbed wire.  R. 252 and 398.  On June 25, 2007, TG went to Dr. McDonald for the first time.  R. 452.  One of the diagnoses was atopic dermatitis.  R. 383. Subsequent visits also refer to a diagnosis of atopic dermatitis with medication prescribed for application to TG's face.  R. 370, 377 and 379.

Listing 108.05 states:

Dermatitis (for example . . ., atopic dermatitis. . . ), with extensive skin lesions that persist for at least 3 months despite continuing treatment as prescribed.

20 C.F.R.  part 404, subpart P, app. 1.  section 108.05 states:

---

[3] See January 6, 2006 (R. 201); January 9, 2006 (R. 198-99); February 7, 2006 (R. 194-96); and March 2, 2006 (R. 190).

[4] See January 14, 2005 - contract dermatitis due to plants (R. 209-10); February 25, 2005 - tinea capitis, a fungal infection of the scalp, at which time Dr. Palazzo recommended contact with a dermatologist (R. 205-07); December 29, 2005 - boil on right leg which was drained (R. 211-12); and April 21, 2006 - skin showed plaques with scales and scales were seen on scalp (R. 186-87).

Extensive skin lesions are those that involve multiple body sites or critical body areas, and result in a very serious limitation. Examples of extensive skin lesions that result in a very serious limitation include but are not limited to:

a.      Skin lesions that interfere with the motion of your joints and that very seriously limit your use of more than one extremity; that is, two upper extremities, two lower extremities, or one upper and one lower extremity.

b.      Skin lesions on the palms of both hands that very seriously limit your ability to do fine and gross motor movements.

c.      Skin lesions on the soles of both feet, the perineum, or both inguinal areas that very seriously limit your ability to ambulate.

20 C.F.R.  part 404, subpart P, app. 1.  section 108.00.  There is no evidence that TG had skin lesions like the examples found in the regulation.  Both Drs. Galen and McDonald checked the blanks on the questionnaire indicating that TG had extensive skin lesions.  In the absence of any medical records from Dr. Galen it is not possible to determine on what he based this conclusion.  Dr. McDonald's records refer to the atopic dermatitis in connection with the while yellow scale and matting in her scalp and possibly face.  R. 384.  Dr. McDonald ordered analysis for tissue from TG's scalp.  R. 374 and 381.

Dr. Shrum also was a treating dermatologist.  R. 153.  In 2002, he described the atopic dermatitis as the most consistent diagnosis during his ten month treatment of TG.  It consisted of fine papular lesions over the trunk and face.  It was described as a chronic condition which is cyclical in nature.  R. 153.  This is consistent with the reports by Dr. Palazzo of periods without skin symptoms.

There is substantial evidence to support the ALJ's finding that TG's atopic dermatitis did not meet the listing criteria.  The circumstances are distinguishable from Williams v. Astrue, 355 Fed.Appx. 828, 2009 WL 4716027 (5th Cir. 2009).  In Williams, the evidence before the ALJ

consisted primarily of the treatment notes and opinions of the claimant's three treating physicians. All of them agreed that the claimant was unable to perform anything but sedentary work. The ALJ refused to give their opinions controlling weight. Id. at *3. The Fifth Circuit said that "[a]ssuming that the ALJ was entitled to not give these physicians' opinions controlling weight, there is still *no* evidence supporting the ALJ's finding. . . . [and] the ALJ impermissibly relied on his own medical opinion as to the limitations presented. . . ." Id. Like Williams there are three treating dermatologists. Unlike Williams there are no records for one of them, Dr. Galen, and one of them, Dr. Shrum, did not find that atopic dermatitis limited TG's functioning.

### d.   Listing 103.03 Asthma.

On January 5, 2006, TG reported wheezing which was worse at night. R. 201. Dr. Palazzo's diagnosis was mild persistent asthma. R. 203. On June 1, 2006, TG began seeing Dr. Yerneni. R. 462. On March 14, 2007, Dr. Yerneni reported to the Social Security Office that he was "treating her for acute bronchitis and asthma. She often must use an inhaler to assist her in relief of this breathing problem." R. 329.

Dr. Yerneni completed a questionnaire for bronchial asthma. He indicated that TG had: (1) persistent low-grade wheezing between acute attacks; (2) an absence of extended symptom-free periods; (3) persistent prolonged expiration; and (4) radiographic or other appropriate imaging techniques indicating pulmonary hyperinflation or peribronchial disease. He indicated that she did not have short courses of corticosteroids. R. 416. He reported that she was not on steroids. R. 417. The plaintiff contends that she satisfies the following listing criteria:

> Asthma. With [p]ersistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with . . . [p]ersistent prolonged expiration with

radiographic or other appropriate imaging techniques evidence of pulmonary
hyperinflation or peribronchial disease. . .

20 C.F.R. part 404, subpart P, app. 1.  section 103.03C.1.  The ALJ found no evidence that the

Listing criteria for asthma was met.  R. 20.  He stated that:

> The claimant has been diagnosed with asthma.  Medical evidence shows that she has
> some low grade wheezing and the use of a bronchial inhaler on an as needed basis.
> However, there is no evidence of any acute attacks, persistent prolonged expirations,
> radiographic or appropriate imaging techniques indicating pulmonary hyperinflation
> or peribronchial disease, or any record of asthmatic related ER visits or
> hospitalizations despite prescribed treatment.

R. 19.

On TG's initial visit to Dr. Yerneni on June 1, 2006, asthma was indicated on the system

review.  R. 462.  On June 21 and 22, 2006, TG went the Bogalusa ER with complaints of headaches,

ear pain and high blood pressure.  Her respiratory effort and rate were normal.  There were no

wheezing breath sounds.  R. 267 and 272.  On June 27, 2006, TG returned to Dr. Yerneni.  Asthma

was not indicated on the system review.  The complaint was hypertension.  R. 465.  On September

20, 2006, TG went to Dr. Yerneni for hypertension.  Although asthma was not indicated on the

system review, it is noted on the diagnosis.  Wheezing was not indicated on the system review.  R.

463.  On September 22, 2006, asthma was indicated on Dr. Yerneni's system review.  R. 464.

Antibiotics and an inhaler were requested.  R. 464.  On September 29, 2006, TG was seen by Dr.

Yerneni for complaints of hyperglycemia and numbness in the hand and foot.  The system review

did not indicate any respiratory problem.  R. 461.  On December 21, 2006, TG was seen at the

Bogalusa ER for hypertension and chest discomfort.  R. 243.  An ECG analysis revealed a normal

sinus rhythm.  R. 247.  A December 21, 2006 chest x-ray found the lungs clear with no active

disease or congestion.  R. 241.  On December 22, 2006, she was seen by Dr. Yerneni, who indicated a cough but not asthma or wheezing.  R. 336.

On January 29, February 8 and February 13, 2007, Dr. Yerneni did not indicate any respiratory symptoms.  R. 335, 455 and 456.  An echocardiogram found a mild degree of pulmonic insufficiency.  R. 330-32 and 471-75.  On February 15, 2007, there was a tonsillectomy and adenoidectomy at Bogalusa Medical Center.  R. 231.  The pre-anesthesia evaluation found all respiratory functions within normal limits.  R. 230.  On March 14, 2007, Dr. Yerneni reported that TG's medical problems included asthma and acute bronchitis.  R. 327, 329 and 366.  On May 23 and June 19, 2007, TG returned to Dr. Yerneni.  The system reviews did not indicate any respiratory problem.  R. 326 and 457.  On June 24, 2007, TG went to Bogalusa ER following the 4-wheeler accident.  The physical exam did not report any respiratory symptoms.  R. 256.  She was transferred to Children's Hospital where no respiratory symptoms were noted on the physical examination.  R. 364.  Dr. Yerneni's system review on July 13, 2007 did not indicate any respiratory symptoms.  R. 458.  On July 20, 2007, he reported that she had a cold.  R. 324.  On August 22, 2007, TG went to Dr. Yerneni for hypertension.  The system review did not report any respiratory symptoms.  R. 434. On that same day she went to Children's Hospital.  The physical exam did not report any symptoms for her chest or lungs.  R. 440.  On September 30, 2007, TG went to Bogalusa ER for moderate pain in her right ear.  The physical exam indicated symptoms for the ear problem but there were no respiratory symptoms.  R. 387.  On October 4, 2007, she returned to Dr. Yerneni.  He did not record any respiratory symptoms on his system review.  R. 435.

On November 27, 2007, Dr. Yerneni's system review indicated a cough, wheezing and asthma. R. 421.  On November 28, 2007, he completed the questionnaire on asthma which TG contends satisfies the listing criteria for asthma.

The listing requires persistent low-grade wheezing between acute attacks.  There is no evidence of acute attacks and there were many examinations without any report of low-grade wheezing.  In the alternative, the listing requires the absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators.  The medical records, including Dr. Yerneni's notes, contain evidence of extended symptom-free periods.  The only echocardiogram reported mild  valve insufficiency.  R. 471-72.  There is substantial evidence for the ALJ's finding that the diagnosis of asthma did not meet Listing 103.03.

### e. __Functionally equals the listings__.

Pursuant to 20 C.F.R. § 416.923, in determining whether a claimant's physical impairments are of such medical severity that such impairments could be the basis for eligibility, the Commissioner is required to consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  See also 20 C.F.R. § 416.924a(b)(4).  A claimant's impairments functionally equal the listings if a claimant has a marked limitation in two of six domains or an extreme limitation in one domain.  20 C.F.R. § 416.926a(d).  The ALJ found that TG had less than marked limitations in the domains of interacting and relating with others and health and physical well-being.  R. 26-29.  He found no limitation for the domains of acquiring and using information, attending and completing tasks, and moving about and manipulating objects.  Ms. Green did not contend that there was any limitation for the domain of caring for yourself.  R. 24-28.

The ALJ described Dr. Galen as opining that TG's limitations caused no limitations in the domains.  R. 23.  As discussed above, the ALJ misunderstood Dr. Galen's response to the questionnaire.  Accordingly, the ALJ improperly afforded controlling weight to a opinion which did not exist.  This raises the issue of whether the ALJ would find that TG did not have a combination of impairments that functionally equaled the listings without the benefit of Dr. Galen's alleged opinion.

When Dr. Yerneni completed the questionnaire on the asthma listing on November 28, 2007, he indicated that TG had marked or extreme limitations in her functioning for all of the domains except caring for herself in most day-to-day activities.  R. 416-17.  Dr. Yerneni was TG's treating pediatrician from June 1, 2006 through November 28, 2007.  He saw her at least sixteen times during this period.  He referred TG to: (1) Dr. Susan Crawford, who performed a tonsillectomy and adenoidectomy; (2) Dr. Kate McDonald, a dermatologist; (3) Dr. Victor Pouw, a pediatric endocrinologist for precocious puberty; and (4) Dr. Richard Coulon, a pediatric neurosurgeon.  The ALJ found that Dr. Yerneni's determination was inconsistent with the evidence of record.  To the extent the evidence of record includes Dr. Galen's alleged opinion, there is a question as to whether the ALJ would assign more weight to Dr. Yerneni's opinion with a correct understanding of Dr. Galen's response to the questionnaire.

When Dr. McDonald completed the questionnaire on the atopic dermatitis on November 19, 2007, she indicated that TG had marked limitations in the domains of interacting and relating with others, moving about and manipulating objects and health and physical well-being.  Dr. McDonald was TG's treating dermatologist from June 25, 2007 through November 19, 2007.  During this period she saw TG six times.  The ALJ gave little weight to this opinion.  R. 23.  The Commissioner

argued that this was proper because Dr. McDonald saw TG only once and lacked a longitudinal treatment relationship with TG.  As discussed above that is incorrect.

For these reasons it is not possible to conclude whether the ALJ's determination that TG did not have a combination of impairments that functionally equaled the listings was supported by substantial evidence and whether the ALJ applied the appropriate legal standards in evaluating the evidence.  The evidence does not clearly establish TG's disability, so the matter should be remanded for further proceedings.

The plaintiff contends that the ALJ improperly relied on the opinion of Dr. Halphen who did not treat or examine TG.  The ALJ described Dr. Halphen's opinion as consistent with the medical record and accorded it great weight.  R. 24.  The plaintiff argues that Dr. Halphen's opinion cannot constitute substantial evidence to reject the findings of the treating physicians, Drs. McDonald and Yerneni.  In Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000), the Fifth Circuit stated that, "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Here, the ALJ did not fully explore the treatment by Dr. Galen and the reliance on Dr. Halphen appears strained in light of the opinions of the treating physicians, Drs. Yerneni and McDonald. Because of the need to remand the case, however, it is not necessary to consider whether the ALJ improperly relied upon the opinion of Dr. Halphen.

**Issue no. 3.**    Did the ALJ err by not contacting the treating physician pursuant to 20 CFR 404.1512(e)(1).

The plaintiff contends that if the ALJ required information from Drs. Galen and McDonald discussing TG's medical signs and other information to support their conclusions on the responses to the questionnaires, the ALJ was required to contact the treating physicians for such information. See 20 C.F.R. 4014.1512(e).  In Newton, the Fifth Circuit stated:

> [I]f the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, <u>absent other medical opinion evidence based on personal examination or treatment of the claimant</u>, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e).

299 F.3d at 453 (emphasis added). On remand the Commissioner is directed to contact the treating physicians to obtain clarification and all records of TG's treatment.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that: (1) plaintiff's motion for summary judgment (Rec. doc. 17) be GRANTED in PART and DENIED in PART; (2) defendant's cross-motion for summary judgment (Rec. doc. 18) be DENIED; and (3) the action be remanded to the Commissioner for further proceedings consistent with this report.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (<i>en banc</i>).

New Orleans, Louisiana, this 27th day of October, 2010.

**SALLY SHUSHAN**
**United States Magistrate Judge**

32